IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN IN | : |
|         **Plaintiff,** | : |
| | :   **Civil Action** |
|     v. | :   **No. 24-21 (CFK)** |
| ROGER BIRCH | : |
|         **Defendant.** | : |

## AMENDED COMPLAINT

Plaintiff John In was incarcerated for nearly fifteen years for a crime he did not commit, until DNA evidence exonerated him and definitively established that Defendant Police Officer Roger Birch fabricated evidence that caused his wrongful conviction. Mr. In now sues Defendant Birch to secure some measure of justice for the years that Defendant Birch stole from him.

### PARTIES

1. Plaintiff John In is an adult with a place of residence at 11303 Elam Drive, Glen Mills, Pennsylvania.

2. Defendant Roger Birch (Badge No.6325) was, at all times relevant to this complaint, a police officer employed by the Philadelphia Police Department who participated in the investigation of a burglary and robbery involved in this case.

### FACTUAL ALLEGATIONS

3. In the early morning of March 7, 2007, three men entered the house at 720 Mifflin Street in Philadelphia, Pennsylvania, which was occupied at that time by at least five people.

4. The three men—Jerry Jean, Dyshon Marable, and a third man—entered the home to commit a burglary and robbery.

5. Plaintiff John In was not one of those men.

6. Nonetheless, In would later be arrested, charged, convicted, and – after nearly 15 years in custody – exonerated of this home invasion burglary and robbery.

7. On the night in question, the house was occupied by Vuthary Yun, Mr. Yun's daughters, Dina Khem, Christina Khem and Angela Khem, and his son, Keith Khem.

8. Upon entering the house, the three men encountered Mr. Yun in the kitchen washing dishes.

9. The men pointed a gun at Mr. Yun and pushed him towards the basement while demanding money.

10. The third intruder – by Mr. Yun's recollection, the tallest of the three – took Mr. Yun into the basement while the other two remained upstairs on the first floor of the house.

11. On the basement steps, the third, and tallest, intruder held the gun to Mr. Yun's head, tied Mr. Yun's hands behind his back with a cord, and placed a cloth gag in his mouth while continuing to demand jewelry and cash. This intruder wore a hood that obscured his face, and Mr. Yun thought it prudent not to look too closely at his features.

12. While the third intruder was walking Mr. Yun to the basement, Mr. Yun's daughter, Dina, who was sleeping in her basement bedroom at the time, awoke and heard the two speaking. She called the police on her mobile phone and stepped out of her room when she heard police officers arrive, and then began walking up the stairs to the ground floor.

13. Dina Khem observed her father and the third intruder at the top of the basement steps where the intruder held a gun with one hand while he used his other hand to hold the knob of the basement door.

14. Dina Khem called out to her father in the Cambodian language but returned to her

room when the third intruder threatened her, pointed his gun at her, and told her to "shut the fuck up".

15. As she retreated, Dina Khem saw her youngest sister, Angela, attempt to open the basement door, but the third intruder held it closed.

16. In the meantime, the other two intruders, Jean and Marable, made their way to the second floor (third level) of the house.

17. There, Jean and Marable encountered Mr. Yun's daughter, Christina, asleep in her bed. Jean and Marable woke Christina and demanded her jewelry. Christina observed that one of the men was wearing a green sweatshirt and the other, a blue sweatshirt.

18. Marable, the man in the blue sweatshirt, kept watch over Christina as Jean – the man in the green sweatshirt – moved to the next room.

19. There, Jean found Christina's 11-year-old brother, Keith, asleep. With Keith still asleep, Jean called Marable and Christina into the room and demanded the family's money and jewelry.

20. Jean then began to search the room for valuables when police arrived at the house and called up the stairs to locate the individual who had called 911.

21. Jean then approached Christina Khem and put his gun to her waist and covered her mouth with his hand. On that hand, Jean was wearing a latex glove.

22. As police continued to call out, Jean released Christina and went into a second floor back room.

23. Christina then ran downstairs to her sister, Angela, and a group of police, all of whom were waiting at the entryway inside of the house. Christina pointed the officers upstairs and to the back room. Some of the officers ran upstairs while others ran to the back of the house.

24. Police Officers Robert Robinson and Felicia Battles moved to the back of the house. As Officer Robinson passed through the backdoor of the house into the rear yard, Jean, who was already outside, rushed past him toward the back of the yard. Officer Robinson believed that Jean had jumped from a rear second story window since there was no other way out of the house to the rear yard.

25. The fleeing Jean briefly took cover in a shed-like structure, then leapt a fence at the back of the property and fled out the alley.

26. Rather than scale the fence, Officers Robinson and Battles ran around the front of the house to catch up with Jean.

27. There, they encountered Officer Kevin Cannon. Cannon was in the process of apprehending Jean after finding Jean crouching between two parked cars.

28. Jean's DNA was on a latex glove found in the rear alley behind the house in the 700 block of Mifflin Street where he had been seen fleeing.

29. About an hour later, police found Dyshon Marable, hiding in a closet beneath a pile of coats on the second floor of 720 Mifflin.

30. While the circumstances surrounding Jean and Marable's involvement and arrests were undisputed (and led to their guilty pleas), Plaintiff John In's purported involvement was fiercely contested at his trial.

31. At trial, evidence was presented that, while officers were occupied pursuing Jean, the third intruder—who had been in the basement, wore "dark clothing," and was tall—ran past Christina and Angela Khem toward the front door, pausing briefly to exclaim "Oh shit! What's happening?" before exiting.

32. Shortly afterward, when Officer Cannon got out of his police vehicle to apprehend

the crouching Jean, he observed a white Nissan Altima parked nearby with its headlights on. The Nissan Altima then reversed and sped off eastbound on Mifflin Street.

33. While officers in the area were then unaware that anyone other than Jean had fled the Mifflin Street house, they believed that the speeding Nissan Altima was likely tied to the burglary. Accordingly, officers pursued the Nissan Altima.

34. Mr. In, who had no involvement in the crime, was later observed by Sergeant Steven Woods several blocks away running.

35. Mr. In was never seen inside or in the vicinity of the Nissan Altima. He had no connection to that car.

36. Sergeant Woods seized Mr. In and placed him in the back of a police vehicle alongside Jean.

37. Christina and Dina Khem were both taken to the car.

38. Christina Khem identified Jean but did not identify Mr. In as having been involved in the incident, despite his presence right next to Jean at the show-up.

39. Dina Khem identified Mr. In as the third intruder.

40. The third intruder passed right by Christina Khem as he left the house, but she did not identify Mr. In.

41. Nonetheless, Mr. In was charged with being the third perpetrator.

42. At trial, the prosecutor argued that Mr. In was the third intruder.  According to the prosecution's theory, In took Vuthary Yun hostage at gunpoint and led him into the basement. The prosecution argued that Mr. In was the person who pointed the gun at Dina Khem, and the person who then fled through the front vestibule, out the front door past two of the home's other occupants, Christina and Angela Kim.

5

43. The prosecutor argued further, that after fleeing the Mifflin house, Mr. In headed to a white Nissan Altima where he stowed his gun and sped off when police approached the car. Not long after, according to the prosecutor, In crashed the Nissan Altima and attempted to flee on foot before ultimately being apprehended by police.

44. The prosecution's theory concerning Mr. In's guilt centered on evidence fabricated by Defendant Birch, as explained below.

45. In federal habeas proceedings, Dina Khem's identification was determined to have been a misidentification, leading to Mr. In's ultimate exoneration.

46. That determination was reached by the Philadelphia District Attorney's Office's Conviction Integrity Unit, following (and confirming) the DNA investigation conducted by Mr. In's habeas counsel.

47. That DNA investigation focused on the physical evidence police recovered from the crime scene, some of which contained the crucial DNA deposit that established Mr. In's innocence. The physical evidence included the following:

   a. A gun that was recovered in the backyard of the Mifflin Street house in the structure where Jean hid briefly from police;

   b. A piece of latex glove that was recovered from the alley behind the house near where Jean scaled the fence to avoid arrest;

   c. Another piece of latex glove that was recovered from the highway on the 600 block of Mifflin Street;

   d. A third piece of latex glove that was recovered from the Mifflin Street house front vestibule through which the third perpetrator fled the house after police arrived;

   e. A second firearm, a rubber glove, and a box of latex gloves that were recovered from the Nissan Altima as well as a rubber glove and a box of latex gloves. (The vehicle also contained proof of ownership for the vehicle for an individual Roan Adderly, a Pennsylvania driver's license in the name of Smith Printemps, three traffic tickets in the name of Jerry Jean, and assorted personal items); and

6

      f.   The fingertip of a latex glove recovered from the front pocket of a green hooded sweatshirt that Jean was sitting on when he was arrested.

48.    Before Mr. In's trial, five of the items collected as evidence—the three pieces of latex and two firearms—were swabbed for DNA which was then compared to DNA from Jean and Mr. In. The results of that testing were as follows:

      a.   The piece of latex glove found in the alley behind the Mifflin Street house yielded a DNA sample that matched Jean but not Mr. In;

      b.   The piece of latex glove found on the highway on the 600 block of Mifflin Street did not conclusively match Jean, but Jean could not be excluded as a possible contributor. Mr. In, however, was excluded as a possible contributor;

      c.   Jean and Mr. In were also excluded as contributors from the DNA samples collected from the two guns; and

      d.   Both Jean and Mr. In were excluded as contributors to the piece of latex glove found in the home's front vestibule.

49.    All witnesses agreed that there were three men inside of the home.

50.    Therefore, excluding Marable as a contributor of the DNA in the glove found in the vestibule would have established Mr. In's innocence.

51.    Marable's DNA, however, was never collected or compared to the DNA found on the vestibule glove.

52.    Habeas counsel for Mr. In obtained Marable's DNA and had it tested for comparison against the DNA recovered on the piece of the latex glove that was recovered by police in the vestibule of the Mifflin Street house.

53.    The results of the DNA testing excluded Marable as the source of the DNA on the latex glove remnant.

54.    With the exclusion of Marable's DNA, Jean, Marable, and Mr. In were excluded as contributors to the DNA found in the piece of latex glove recovered from the vestibule.

55. This fact compelled – and compels – the conclusion that the third intruder, who ran from the basement through the vestibule, was not Mr. In.

56. On the strength of this new evidence, Mr. In filed a habeas corpus petition in federal court seeking relief from his judgment.

57. The District Attorney's Office initiated an independent investigation of the case, with particular attention to this DNA evidence.

58. The District Attorney's Office obtained a voluntary buccal swab from Mr. Marable, and the Philadelphia Police Department Office of Forensic Services did its own report comparing the DNA from Mr. Marable to the DNA reports prepared in anticipation of Mr. In's trial.

59. After analyzing Mr. Marable's referenced sample, the Office of Forensic Services independently concluded that Marable was excluded as a contributor of the DNA recovered from the scrap of latex glove.

60. In addition, the Offices of Forensic Services analyzed the latex scrap and the firearm recovered from the Altima. That analysis revealed sufficient DNA material in common between the latex scrap and the firearm recovered from the crashed Nissan Altima to reach the conclusion that the DNA obtained from both items was deposited by the same individual—and thus not Mr. In (whom, as pled below, Officer Birch falsely alleged was driving the vehicle).

61. As a result of this new evidence, the federal court granted Mr. In's habeas petition and vacated his sentence and ordered a new trial.

62. In or around the first week of June, 2022, the Commonwealth filed a motion to *nolle pros* all charges against Mr. In, which was granted by the Philadelphia County Court of Common Pleas, and the case against him was dismissed.

63. On June 10, 2022, Mr. In was released from prison, after 15 years of incarceration for a crime he did not commit.

64. Even without the DNA evidence that eventually exonerated Mr. In, there were several factors that cast legitimate doubt on the integrity and accuracy of Dina Khem's identification of Mr. In as the perpetrator in her basement.

65. First, Dina Khem's identification took place under highly suggestive circumstances after she witnessed the perpetrator for only two to three seconds during the crime.

66. The suggestive circumstances included that:

   a. Mr. In was presented to her in the back of police wagon next to a person who had been involved in the crime and was unquestionably present in the house;

   b. When Dina Khem viewed both individuals she was in the company of her sister who was in the process of identifying Jerry Jean; and

   c. Police commentary independently suggested to Dina Khem the criminal involvement of the men who were presented to her when police stated that the man standing next to Mr. In had earlier been wearing a green sweatshirt that Christina Kem had seen the perpetrator wearing in the building.

67. Second, the man who escaped through the vestibule was in close quarters with Christina Khem, yet when she viewed Mr. In she did not identify him as that man.

68. Third, none of the witnesses, including Christina Khem, described the clothing worn by the man who ran from the basement through the vestibule of the house as having writing on it, writing that was apparent on the clothing Mr. In was wearing when he was arrested after the incident. Thus, even without the DNA evidence exonerating Mr. In, there was ample basis for the jury to question Dina Khem's identification of Mr. In as the perpetrator.

69. Those bases for reasonable doubt and Mr. In's ability to receive constitutional due process of law and a fair trial, however, were obliterated by the falsification and fabrication of evidence by Defendant Birch, one of the police officers who responded to the crime scene.

70. Birch supplied untruthful facts in his own handwritten report and in an interview to police investigators and the prosecutor who used this fabricated information prepare for the trial and to present his perjurious testimony, which the prosecutor emphasized and relied upon to construct her theory of Mr. In's guilt at his trial.

71. The prosecutor particularly emphasized the importance of Defendant Birch's testimony in establishing the burden of proof necessary to win a conviction over Mr. In.

72. Birch's fabricated evidence was not only material to Mr. In's conviction, it was critical.

73. Birch's fabrications included the following given to police investigators and prosecutors at different times after Mr. In's arrest:

   a. that after arriving at the scene of the crime, Birch saw an Asian guy run northbound on 6th Street and get into a White Altima on the corner of 6th and Mifflin;

   b. that the Asian male looked in Birch's direction after entering the White Altima before driving off;

   c. that Birch activated lights and siren on his police vehicle and chased the fleeing vehicle into the 500 Block of Mifflin Street;

   d. that Birch observed the Asian male crash the vehicle into a house at 526 Mifflin Street, exit the vehicle and run west on Mifflin Street;

   e. that Birch exited his police vehicle following the crash of the Altima and began chasing the Altima's driver on foot at that time;

   f. that Birch observed the driver of the White Altima kneeling next to the vehicle, made eye contact with that individual and then observed that individual enter the Altima from the passenger side, move over to the driver side, place the vehicle in reverse and drive it off at a high rate of speed;

   g. that Birch put out flash information over police radio providing information about Mr. In and the Altima immediately after the Altima drove off from 7th and Mifflin Streets;

   h. that Birch observed the driver of the Altima exit the vehicle after the crash and run westbound on Mifflin Street; and

    i. that Birch chased on foot the male who fled from the Altima and that Birch police officer Wood apprehended him - Mr. In - a short time later.

74. These false statements to investigators and prosecutors were plainly designed to construct an identification narrative where Birch had an opportunity to first carefully observe Mr. In when he was alleged to have been squatting next to and then entering in the perpetrators' get-away car, pursued him by car in flight from the crime scene, and finally pursued him on foot until Mr. In's apprehension by another officer.

75. The narrative, however, was false and built upon numerous false statements by Birch that are rebutted by the 911 transcript, other police testimony, crime scene evidence, and the DNA evidence exonerating Mr. In.

76. Birch's fabrications were transformed into false evidence at trial which was relied upon by the prosecution to win a conviction of Mr. In following a grossly unfair trial.

77. At trial, Defendant Birch testified that when he arrived on the scene, he observed Mr. In "kneeled down" (hiding) behind a white Nissan in the 600 block of Mifflin Street, near the corner of 7th and Mifflin and then fled in the vehicle. He testified that he then gave flash information about the person he observed who fled the scene; a person he later identified as John In. The 911 transcript refutes that statement.

78. Birch further testified that Mr. In then jumped through the passenger's side of the car, put it in reverse, and drove eastbound in the 600 block of Mifflin Street. Defendant Birch testified that he followed the Nissan Altima in his police cruiser until the Nissan Altima crashed into a house on the 500 block of Mifflin Street after making a sudden turn, likely because a second police cruiser was approaching from the other direction.

*79.* Birch went on to testify that the Nissan crashed into a house in the 500 block of Mifflin, and the driver, whom Birch identified as Mr. In, took off running, with Defendant Birch

in foot pursuit.

80. Defendant Birch was the only police witness to place Mr. In anywhere near the Nissan.

81. Other evidence, including Birch's own accounts of the events as memorialized in police investigation reports, proves the falsity of Birch's testimony.

82. First, as noted above, while a gun was found in the car, DNA testing excluded Mr. In from being a contributor.

83. Second, on the same day following the March 7, 2007, incident, Birch wrote out a report in longhand, stating that when he arrived on the scene "he observed a male [alleged to be Mr. In] sitting inside (white) Nissan." There was no hint of his later 2008 trial testimony that that same male had been kneeling or hiding by the car, or that the same male jumped through the passenger side to escape.

84. Third, when Birch was interviewed by police investigators, he offered a third version of the actions of the man in the Nissan. In his statement to investigators, Birch stated that when he first arrived, the man was not seated in the car as he had written on the day of the incident, nor kneeling down behind the car, as he testified at trial. Rather, Birch claimed the man was "running Northbound on 6th St."

85. Fourth, Birch's testimony cannot be squared with his fellow officer Kevin Cannon's testimony. Birch placed Cannon right on the scene with him at 7th and Mifflin. Indeed, at trial Cannon testified to having approached that corner where the Nissan was located, and seeing a man – Jean, not Mr. In – crouched, moments before the Nissan took off. Yet Cannon never mentioned that he saw the male Birch purportedly saw (Mr. In), let alone saw the male engaged in any of the activities Birch described. If Birch's testimony was truthful and accurate,

Cannon would have easily seen Mr. In kneeling beside or running toward the Altima. Cannon, though, never reported or testified seeing Mr. In, or anyone, entering or running toward the Altima.

86. Fifth, other evidence in the case flatly contradicted Birch's account that he was next to the Nissan in his RPC, when the man fled from inside the Nissan. Birch testified that he pursued the Nissan into the 500 block of Mifflin Street, where it crashed. He maintained that that was where he put his RPC in park, exited it, and proceeded to chase the man who had jumped out of the Nissan. Birch put himself, and his car, midpoint between 5th and 6th Streets, on Mifflin (524 Mifflin).

87. From this testimony, a juror would naturally infer that Birch was right next to the man, and thus credit his identification of the man as Mr. In.

88. But after Mr. In was in police custody, Birch put out a call to his fellow officers to retrieve his vehicle, which he described on police radio as "sitting . . . on the **700 block** of Mifflin Street."

89. Officer Peter Seabron also confirmed that Birch did not drive into the 500 block of Mifflin. Birch had testified that when he returned to his vehicle allegedly in the 500 block of Mifflin, Officer Seabron was tending to it.

90. But Seabron refuted this in his own statement and testimony. He testified that he was in the 500 block of Mifflin with the abandoned Nissan after the driver fled, ***but he did not see Birch's car there.*** Additionally, Seabron testified that the pursuit that led to the crash was "foot pursuit," not vehicular pursuit.

91. Sixth, Birch's statement and testimony that he participated in apprehending Mr. In was also false. The police 911 transcript alone proves as much. Sergeant Woods, who arrested

13

Mr. In, and was in RPC 4C, was heard to ask for a wagon at 5th and Hoffman. Birch, who was in RPC 33, then asks police radio if *he* should go to 5th and Hoffman. ("33, that's where you want me at, 5th and Hoffman?"). Police radio answers affirmatively, and then engages with Sergeant Woods about whether anyone was injured as a result of his apprehension of Mr. In.

92. The false testimony of Officer Birch powerfully buttressed Dina Khem's identification and the prosecution's theory that Mr. In was inside the home and fled from the home.

93. The prosecution expressly relied on Defendant Birch statements to investigators and testimony and highlighted its centrality to its case. The prosecutor told the jury that it could find Mr. In guilty only if is it believed that Officer Birch lied. As a result of the postconviction DNA investigation that proved Mr. In had nothing to do with this terrible crime, it is now especially clear that he did lie.

94. Officer Birch never revealed the truth about the evidence he fabricated to the prosecution.

95. No police officer did.

96. On September 15, 2008, the jury returned guilty verdicts on the charges of burglary, robbery, possession of an instrument of crime and violations of the Uniform Firearms Act.

97. On December 19, 2008, Mr. In was sentenced to an aggregate term of 25-50 years imprisonment followed by ten years probation.

98. Following his conviction, Mr. In continued to assert his innocence and continued his investigation of the case. That investigation led to his DNA exoneration that laid bare the rank fabrications of Defendant Birch, fabrications that led to Mr. In's conviction and

incarceration for nearly 15 years.

### **DAMAGES**

99. The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of Defendant Birch caused Mr. In to be unfairly tried, wrongfully convicted, and forced to serve nearly 15 years in prison for a crime he did not commit.

100. As a direct result of Defendant's conduct and omissions, Mr. In sustained injuries and damages, including loss of freedom and youth for nearly 15 years between the ages of 23 and 38, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

101. As a direct result of Defendant's conduct and omissions, Mr. In was deprived of his familial relationships, romantic relationships, and friendships.

102. As a direct result of Defendants' conduct and omissions, Mr. In sustained economic injuries and damages, including loss of income and loss of career opportunities.

103. As a direct result of Defendants' conduct and omissions, Mr. In sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

### COUNT I
### 42 U.S.C. § 1983: Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence

104. Plaintiff incorporates the preceding paragraphs by reference.

105. Defendant Birch acted within the scope of his employment with the PPD,

deprived Mr. In of his clearly established right to due process of law and a fair trial by fabricating inculpatory evidence.

106. Defendant Birch deprived Mr. In of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and the defense, including, without limitation, information regarding the true circumstances of his observations and activities on the date of Mr. In's arrest.

107. Defendant Birch deprived Mr. In of his right to a fair trial by deliberately falsifying the evidence against him.

108. Defendant Birch performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Goodwin's clearly established constitutional rights. No reasonable officer in 2007 would have believed this conduct was lawful.

109. Defendant Birch's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. In's injuries. Defendant Birch knew, or should have known, that his conduct would result in Mr. In's denial of a fair trial, wrongful conviction and incarceration.

## COUNT II
### Outrageous Conduct Causing
### Severe Emotional Distress under Pennsylvania Law

110. Plaintiff incorporates the preceding paragraphs by reference.

111. Defendant Birch by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Mr. In.

112. The acts or omissions of Defendant Birch as alleged in the preceding paragraphs constitute the tort of Outrageous Conduct Causing Severe Emotional Distress, all to Mr. In's

great detriment and loss.

113. As a result of Defendant Birch's conduct, Mr. In suffered and continues to suffer damages as described above.

**RELIEF DEMANDED**

WHEREFORE, John In respectfully requests that the Court grant the following relief:

A. A declaratory judgment that Defendant Birch violated Mr. In's rights under the Fourth, and Fourteenth Amendments and Pennsylvania law;

B. An award of compensatory damages against all Defendants in an amount to be determined by the finder of fact;

C. An award of nominal damages against Defendant Birch in an amount to be determined by the finder of fact;

D. An award of punitive damages against Defendant Birch in an amount to be determined by the finder of fact;

E. Reasonable attorney's fees and costs; and,

F. Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

_Alan Tauber_____
**Karl Schwartz, Esquire**
**Alan J. Tauber, Esquire**
**Jon Cioschi, Esquire**

**Wiseman & Schwartz**
**718 Arch Street, Suite 702**
**Philadelphia, PA 19106**
**(215) 360-3988**
*atauber@atauberlaw.com*
*cioschi@wisemanschwartz.com*